**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Southern Division**

| | | |
|---|---|---|
| ANGELITA BAILEY, | : | |
| | : | |
| individually, and on behalf of | : | |
| all others similarly situated, | : | |
| | : | Civil Action No. 8:23-cv-827-DKC |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| MERCURY FINANCIAL, LLC, | : | |
| | : | |
| Defendant. | : | |

**PLAINTIFF'S SURREPLY IN OPPOSITION TO DEFENDANT'S MOTION TO COMPEL ARBITRATION AND STAY PROCEEDINGS AND TO STRIKE CLASS ALLEGATIONS**

Plaintiff, Angelita Bailey, files this Surreply to respond to five new arguments, a new declaration and a new document from Defendant Mercury Financial, LLC ("Mercury"), in its Reply in Support of Motion to Compel Arbitration and Stay Proceedings and Strike Class Allegations. *See* ECF No. 15 (the "Reply").

**I.      Introduction**

Most of the arguments in Mercury's Reply were already refuted in Plaintiff's Opposition to Mercury's motion. *See* ECF No. 11 (the "Opposition"). Plaintiff will not address those arguments again here. However, Mercury's Reply included five *new* arguments, which it contends are supported in part by a *new* declaration (*see* ECF No. 15-1) (the "New Declaration") and a *new* document (see ECF No. 15-2) (the "New Terms of Use"). Plaintiff never had the opportunity to see or respond to the new arguments or affidavit in her Opposition.

Mercury's five new arguments are:

1. That Mercury is the agent of First Bank & Trust;

2. That FB&T sold Plaintiff's account directly to Velocity;

3. That federal law requires Mercury to provide Plaintiff advance notice of changes to the arbitration and delegation clauses which Mercury relies upon here;

4. That the language of the Cardholder Agreement prohibits retroactive changes to the arbitration and delegation clauses; and,

5. That the Court should save the arbitration and delegation clauses in the Plaintiff's illegal loan agreement from being illusory by applying the equitable "implied covenant of good faith and fair dealing."

Although Plaintiff did not have the opportunity to respond to Mercury' new documents or arguments in the normal course of briefing, none of these documents or arguments support compelling Plaintiff to arbitrate, as discussed below.

## II.     Mercury Has Provided No Evidence that It Is the Agent of the Owner of Plaintiff's Account

First, Mercury has provided no evidence to support its new argument that it is FB&T's agent, only an unsupported allegation in a brief. In any event, FB&T sold Plaintiff's account long ago, so if Mercury really was FB&T's agent it would not make a difference.

As discussed in Plaintiff's Opposition to Mercury's motion to compel arbitration, one of the reasons that Mercury cannot compel arbitration is that it the arbitration and delegation clauses that Mercury relies upon do not even purport to be agreements between Plaintiff and Mercury, and do not purport to benefit Mercury or to allow Mercury to invoke them. Instead, the arbitration and delegation clauses, by their terms, purport only to be agreements between FB&T and Plaintiff.

2

In its Reply, Mercury addresses that argument by repeatedly making the unsupported new argument that "Mercury is nonetheless covered by the Arbitration Provision as a Related Party ***because it is FB&T's agent***." Reply at 15 (emphasis added). But despite filing two affidavits – including the new affidavit with its Reply brief – Mercury has provided absolutely *no evidence* that it "is FB&T's agent." Instead, Mercury's original declaration claims that FB&T assigned it servicing rights in 2017 (*see* ECF No. 7-2 ¶ 5) and its New Declaration claims that FB&T assigned it servicing rights in 2018 (*see* ECF No. 15-1 ¶ 7). But neither declaration presents any evidence that any assignment of servicing rights carried with it the status of being FB&T's agent.

And though Mercury submits its New Terms of Use to support its argument that it is FB&T's agent, that new document actually supports reaching the opposite conclusion. The New Terms of Use do not ever refer to Mercury as FB&T's agent. Instead, they permit Mercury to "disclose and transfer any information that you provide through this Website or through other communication with us: (i) to FB&T['s] … agents." ECF No. 15-2. If anything, that provision suggests that Mercury is *not* FB&T's agent, as it identifies FB&T's agents as separate parties with whom it can share information. Furthermore, the New Terms of Use are dated June 24, 2021 – ECF No. 15-2 at 7 – which, according to Mercury's own New Declaration was long after Plaintiff's account was assigned away from FB&T. *See, e.g.*, ECF No. 15-1 ¶ 8 (claiming Plaintiff's account was assigned by FB&T to Velocity in October, 2020).

Which leads to the perhaps more important point that Mercury has presented no evidence that it is or ever was the agent (or even servicer) of the *current* owner of the account. That is crucially important. Again, Mercury's new affidavit states that FB&T *sold its rights* to Velocity some three years ago. *See* ECF No. 15-1 at ¶ 8. The assignment means that Velocity

3

now stands in FB&T's shoes – and now, only Velocity and its agents would be able to invoke any arbitration or delegation clauses, not Mercury:

> This Court has observed that an assignment allows a third party to "stand in the shoes" of an original party to the contract, *Miller v. Pac. Shore Funding*, 224 F. Supp. 2d 977, 996 (D. Md. 2002), "transfer[ring] all interests in the property from the assignor to the assignee." *Roberts v. Total Health Care, Inc.*, 349 Md. 499, 709 A.2d 142, 148 (Md. 1998). As Judge Blake of this Court has previously noted, an assignment effectively replaces the name of the assignor in the contract with that of the assignee, removing any need for a contract to anticipate an assignee by, for example, specifically naming him as a future party. *Graham v. Santander Consumer USA, Inc.*, No. CCB-17-3148, 2018 WL 2462881 at *2, 2018 U.S. Dist. LEXIS 91802 at *6 (D. Md. June 1, 2018).

*Holloman v. Consumer Portfolio Servs., Inc.*, No. CV RDB-23-134, 2023 WL 4027036, at *8 (D. Md. June 15, 2023). Critically, Mercury provides no evidence, or even any claim, that it is the agent or even servicer of the account's current owner, Velocity.

In fact, this case is the "flip side" of *Holloman v. Consumer Portfolio Servs., Inc.* In *Holloman*, the plaintiff argued that an undisputed agent of the *assignee* was not able to compel arbitration because it was not the agent of the *assignor* – but the Court rejected that argument because the assignee had replaced the assignor, and stood in its shoes. *See id.* So, in *Holloman*, the assignee's agent was covered by the arbitration clause – but the assignor's agent would not have been because it sold its rights away.

The situation here is the opposite of *Holloman*. Here, Mercury claims only to be the agent of the assignor, FB&T, who was long ago replaced by the assignee, Velocity. Mercury does not even claim to be an agent of the assignee Velocity – so when Velocity took assignment of Plaintiff's account, any rights that Mercury had as the purported agent of the assignor were extinguished and those rights only apply to Velocity's agents. *See Holloman*, 2023 WL 4027036, at *8.

Mercury has not shown that it is an agent of the owner of Plaintiff's account, which is one reason, among the many reasons discussed in the Opposition, that no arbitration agreement exists between Mercury and Plaintiff.

### III. Mercury's New Affidavit Creates A Dispute of Material Fact and Demonstrates the Need for Discovery

Mercury's New Declaration introduces purported facts about the assignment of Plaintiff's account which conflict with its prior declarations, creating disputes of material fact highlighting the need for discovery.

Where the facts about concerning assignment of arbitration rights are ambiguous, discovery is appropriate. *See*, *e.g.*, *Kennedy v. LVNV Funding LLC*, No. CV1810695JMVCLW, 2019 WL 1789477, at *3 (D.N.J. Apr. 24, 2019)("the Court finds that arbitrability is ambiguous on the face of the Complaint and documents relied upon therein; it is unclear whether an arbitration agreement exists between the parties to this action."); *Page v. N.A.R. Inc.*, No. 18CV2200KSHCLW, 2019 WL 1370146, at *4 (D.N.J. Mar. 26, 2019) (plaintiff "must be given the opportunity to conduct limited discovery into whether [original creditor] Crest validly assigned its rights to [debt buyer] NAR and thereby enabled NAR to invoke the arbitration provision"); *Lance v. Midland Credit Mgmt. Inc.*, 375 F. Supp. 3d 604, 616 (E.D. Pa. 2019) ("we have no basis today to find Synchrony Bank sold its 'rights', including the right to arbitrate, when it sold its 'Accounts' to Midland Funding in a Bill of Sale. We are not reviewing a question of whether Mr. Lance agreed to arbitrate. We are instead reviewing whether Synchrony Bank's assignment of its 'Accounts' includes the separate "rights" to arbitrate. Midland needs to show us what it purchased. As of today, it has not done so.")

Here, as in *Lance*, Mercury has not shown the Court that it is the holder of a right to arbitrate – and its claims about when and to whom rights in Plaintiff's account was sold are conflicting and confusing. In particular, Velocity's state District Court affidavit and supporting documents claim that Velocity acquired Plaintiff's account from *CreditShop*, Mercury's predecessor – but Mercury's New Declaration now claims that Velocity acquired Plaintiff's account directly from FB&T. *See* ECF No. 11-2 at 2 ¶ 3, 46; *see also* ECF No. 15-1 ¶ 8.  And, as mentioned above, Mercury's original declaration claims that FB&T assigned it servicing rights in 2017 (*see* ECF No. 7-2 ¶ 5) but its New Declaration claims that FB&T assigned it servicing rights in 20***18*** (*see* ECF No. 15-1 ¶ 7). Aside from these materially conflicting claims, Mercury's New Declaration does not provide any facts about those assignments, or what rights were assigned from FB&T to CreditShop, or what rights were assigned from CreditShop to Velocity, or why its information about assignment is different from what was presented to the state District Court. As a result, Plaintiff and the Court are left with only Mercury's conflicting declarations and the spare and incomplete documents which the current owner Velocity filed in the state District Court. *See* Plaintiff's Opposition, Exh. 2. Those documents state that Velocity is the current owner of the account, and leave no reason to believe that Mercury has any arbitration or delegation rights. Instead, the currently available documents paint a very incomplete picture. Many salient facts concerning the multiple assignments of Plaintiff's account have been obscured by Mercury's conflicting claims and failure to submit any documents concerning those assignments. Discovery is necessary to clarify who was sold what rights, and when.

Accordingly, to the extent that the Court entertains Mercury's argument that it can invoke arbitration or delegation clauses which never mention it, discovery is necessary to flesh out the facts concerning assignment and what rights were assigned to whom – for example, according to the documents Velocity submitted under affidavit in the state District Court, a

"Management Agreement," "Asset Purchase Agreement," and "Interim Servicing Agreements" related to Plaintiff's loan were apparently assigned on November 9, 2017, and would bear on Mercury's current status – particularly because Mercury claims to be a "servicer" and at least two of the agreements mentioned concern servicing in their title. *See* Exh. 2 to Opp. at 42-45. In addition, the rights assigned to Velocity are apparently specified in a "Purchase and Sale Agreement dated January 30, 2020" related to Plaintiff's loan *See id*. at 46. To the extent Mercury is arguing that it has an existing arbitration or delegation agreement with Plaintiff that was not assigned away under those agreements, it is essential that Plaintiff and the Court at least have the opportunity to see those agreements and what they actually say about what rights are or are not assigned.

The details of the multiple assignments and the rights assigned are material to the question at hand – indeed, Mercury's own declarations in support of its motion to compel arbitration reference the assignments repeatedly. But the details of the assignments are not currently available to Plaintiff or the Court; they are contained in the agreements described above which have not been produced. On this sparse record, the Court cannot conclude that Mercury is entitled to arbitrate as a matter of law. Discovery is necessary. *See*, *e.g.*, Fed.R.Civ.P. 56(d); *Rose v. New Day Fin., LLC*, 816 F.Supp.2d 245, 252 n. 5 (D.Md.2011); *Whitten v. Apria Healthcare Grp., Inc.*, No. PWG-14-CV-3193, 2015 WL 2227928, at \*4 (D. Md. May 11, 2015).

**IV.    Federal Law Does Not Require Advance Notice of Changes to the Purported Arbitration or Delegation Agreements.**

Mercury also newly argues that the arbitration and delegation clauses at issue are not illusory despite the unilateral change-in-terms clause which applies to them on the supposed grounds that "federal law requires that credit card companies provide their cardholders with advance written notice of, and a right to reject, any "significant change in account terms,"

7

including changes to disputes and dispute resolution. 12 CFR1026.9(c)(2)(i) and (ii); 1026.6(b)(2)(xv); 1026.9(c)(2)(iv)(B).

Mercury's argument is misleading at best. Nothing in the cited regulations even arguably requires disclosure of changes to arbitration or delegation agreements. Instead, the regulations Mercury points to require that credit card holders be given notice of their rights to *dispute charges* to the credit card or any changes to those rights to *dispute charges* to the credit card.

Looking to the first regulation Mercury cites, 12 CFR 1026.9(c)(2)(i) requires that:

> when ***a significant change in account terms as described in paragraph (c)(2)(ii)*** of this section is made, a creditor must provide a written notice of the change at least 45 days prior to the effective date of the change to each consumer who may be affected.

*Id*. (emphasis added).

Under this regulation, the only "significant change in account terms" for which notice is required is defined by paragraph (c)(2)(ii). *See id*. That subsection provides that a "significant change in account terms" – the only thing which triggers notice – is limited to:

> a change to a term required to be disclosed under § 1026.6(b)(1) and (b)(2), an increase in the required minimum periodic payment, a change to a term required to be disclosed under § 1026.6(b)(4), or the acquisition of a security interest.

12 CFR 1026.9(c)(2)(ii).

None of the items listed in subsection (c)(2)(ii) include arbitration or delegation clauses, directly or indirectly. Mercury, however, makes the new and strained argument that arbitration clauses are akin to the "right to dispute transactions" which must be disclosed under section 1026.6(b)(2)(xv). *See* Reply at 6 & n.4. But the plain language and context of the regulation refutes that argument. The sole subsection Mercury relies upon (but never quotes) says that the following "reference" is a required disclosure:

> **(xv) Billing error rights reference.** A statement that information about consumers' right to dispute transactions is included in the account-opening disclosures.

*Id*. This required "statement" which informs consumers about where to find information concerning their rights for "[b]illing error[s]" is not a requirement to disclose changes to an arbitration or delegation clause. Instead, this required "[b]illing error rights reference" is on page 2 of Mercury's "Cardholder Agreement." *See* ECF No. 7-5 at 2 ("Billing Rights: Information on your rights to dispute transactions and how to exercise those rights is provided in your Cardmember Agreement.") That required statement has nothing to do with arbitration or delegation clauses.

Indeed, the "Billing Rights" section which the required statement references has nothing to do with arbitration or delegation clauses, either. *See* ECF No. 7-5 at 9 (titled "YOUR BILLING RIGHTS"). Instead, the section outlines a procedure for consumers to dispute charges; a procedure which is conspicuously different from the arbitration and delegation clauses on the preceding page.

In sum, the billing rights disclosures required by 12 CFR 1026.6 and 1026.9 have nothing to do with arbitration. The regulations do not require any notice or right to reject changes to arbitration rights. Accordingly, nothing in those regulations saves the arbitration and delegation clauses here from being illusory.

## V.     The Language of the Unilateral Change-in-Terms Clause Does Not Prevent Retroactive Changes.

Mercury also newly argues that "the plain language of the modification provision requires Mercury to give ***advance*** written notice, which necessarily requires notice of prospective changes, rather than retrospective changes." Reply at 6 (emphasis in original). This is incorrect.[1]

Nothing in the Cardholder Agreement prevents any unilateral changes from having retroactive effect – even if "advance" notice were given. For example, Plaintiff could get notice a day in advance that the arbitration or delegation agreement was changing, but nothing in the Cardholder Agreement would require any such changes to not apply to past claims; nothing in the Cardholder Agreement even prevents such changes from applying to or forbidding arbitrations which have already been filed. The pertinent question is whether both parties are *bound* to the arbitration and delegation "agreements" – so that a mutual promise to arbitrate exists. *See Holloman v. Cir. City Stores, Inc.*, 894 A.2d 547, 555 (Md. 2006) ("we conclude that the provisions of the arbitration agreement which bind Circuit City to arbitrate for at least thirty days and for the entire year prior to the day upon which the agreement may be modified constitute consideration").

Unlike the agreement in in *Holloman v. Circuit City Stores, Inc.*, the present "Agreement" does not preserve Plaintiff's right to arbitrate for any period of time. Instead, it broadly says that "this Agreement (***including its Jury Trial Waiver and Arbitration Clause***), may change and we may ***add or delete any term***." ECF No. 7-5 at 3 (emphasis added). Unlike the plaintiff in *Holloman v. Circuit City Stores, Inc.*, the Plaintiff here would not have the opportunity to arbitrate

---

[1]     In addition to the reasons discussed here, the Opposition discusses other reasons the language of the Cardholder Agreement does not require advance notice of changes. *See* Opp. at, *e.g.*, part III.C.4.

during any period of time without fear of facing a unilateral alteration to the arbitration and delegation agreements. *See Harris v. Blockbuster Inc.*, 622 F. Supp. 2d 396, 399 (N.D. Tex. 2009) ("nothing … prevents Blockbuster from unilaterally changing any part of the contract other than providing that such changes will not take effect until posted on the website."); *Grosvenor v. Qwest Corp.*, 854 F. Supp. 2d 1021, 1034 (D. Colo. 2012) (posting of changes on website did not save illusory nature of unilateral modification clause, because "[a] notice requirement becomes significant when it is coupled with the right to accept or reject the change.") Moreover, because nothing restricts the retroactive application of unilateral changes, "notice" could never save the provision's illusory nature:

> [where] the only express limitation on that unilateral right [to modify 'all rules'] is published notice…there is nothing to suggest that once published the amendment would be inapplicable to disputes arising, or arising out of events occurring, before such publication.

*Morrison v. Amway Corp.*, 517 F.3d 248, 254 (5th Cir. 2008)) (emphasis in *Morrison*). *See also Savostianov v. Fed. Advocs., Inc.*, 2021 WL 1026018, at *3 (D.D.C. Mar. 17, 2021) (same); *McNamara v. S.I. Logistics, Inc.*, 2018 WL 6573125, at *4 (D. Mass. Dec. 13, 2018) (same).

Here, as in *Morrison* and unlike *Holloman v. Circuit City Stores, Inc.*, nothing in the "Agreement" prevents eliminating arbitration or delegation entirely or restricting it to certain claims and disputes, retroactively. 517 F.3d at 254. As a result, it is illusory. Even where an arbitration or delegation clause affirmatively requires notice, the absence of a promise to allow a borrower a chance to invoke arbitration before the change becomes effective makes the agreement illusory:

> the modification provision does include a clause that "Prosper will give you notice of material changes to this Agreement[.]" See, e.g., ECF No. 15-5 ¶ 14. But this is not a limitation on Prosper's ability to change terms in the same vein as *Holloman*. Prosper does not promise to give advance notice so that a borrower could invoke arbitration before a change becomes effective, nor does it contain any time limitation. The modification provision allows Prosper to change the arbitration

11

provision at any time. The Court is not persuaded that the notice requirement within the modification provision limits Prosper's discretion enough such that Prosper's promise to arbitrate still constitutes a binding promise.

*Jones v. Prosper Marketplace, Inc.*, No. GJH-21-1126, 2022 WL 834210, at *16 (D. Md. Mar. 21, 2022). Plaintiff here was not promised the right to invoke arbitration before any changes to the arbitration or delegation clauses, so they are illusory – no such agreements legally exist.

## VI. The Implied Covenant of Good Faith and Fair Dealing Cannot Save the Illusory Arbitration and Delegation Clauses

Mercury also newly argues that the Court should save the arbitration and delegation clauses from being illusory by applying the "implied covenant of good faith and fair dealing," Reply at 7-9. But the Maryland Supreme Court in *Cheek* did not contemplate using an implied covenant to save an otherwise illusory arbitration agreement. If such an implied covenant applied here it would also have applied to *Cheek*. *Cheek* controls, and no Maryland cases allow an implied covenant to displace *Cheek*'s holding that an arbitration clause subject to a unilateral modification clause is illusory. *See Nat'l Fed'n of the Blind*, 904 F.3d at 87 ("the Texas cases the Container Store cites … say nothing about good faith and fair dealing and so offer nothing to back up its lead argument.") [2] Furthermore, this precise "good faith and fair dealing" argument was made to this Court in *Jones* and rejected. *See Jones v. Prosper Marketplace Inc.*, et al., Case No. 8:21-cv-00893-GJH, ECF No. 15-1 at 24-25; *see also Jones v. Prosper Marketplace, Inc.*, No. GJH-21-1126, 2022 WL 834210, at *16 (D.

---

[2] The Maryland cases Defendant cites do not undermine *Cheek*. *Kelley Constr. Co. v. Wash. Suburban Sanitary Comm'n*, 230 A.2d 672 (Md.1967) and *Savonis v. Burke*, 216 A.2d 521 (Md. 1966), were decided decades before *Cheek*, and certainly cannot be read to overrule it. And *Questar Builders, Inc. v. CB Flooring, LLC*, 978 A.2d 651, 672-73 (Md. 2009) distinguishes *Cheek*. *See id.* (construing a "termination" clause in a flooring subcontract which included substantial restrictions, and *contrasting* that with *Cheek*, where "we held that an arbitration clause authorizing one party to "alter, amend, modify, or revoke the [arbitration p]olicy at its sole and absolute discretion at any time with or without notice" rendered the agreement to arbitrate illusory.")

12

Md. Mar. 21, 2022) (holding, despite the defendant's same "good faith and fair dealing" argument, that arbitration clause was illusory).

After all, the Fourth Circuit applied *Cheek* and did *not* apply the implied covenant of good faith and fair dealing to save an illusory arbitration clause in *Noohi* – and in that case, breach of the implied covenant of good faith and fair dealing was a *claim* asserted in the *plaintiffs' complaint*. 708 F.3d at 603. Yet the Fourth Circuit – squarely presented with a case where the implied covenant was at issue – did not find that the implied covenant impaired the holding of *Cheek*; it instead ratified *Cheek* in no uncertain terms. *See* fn. 13. In this case, where *no contract claim* (including no implied covenant claim) is even at issue, the implied covenant cannot make an illusory arbitration agreement not illusory so as to cause it to exist.

In addition, an implied covenant of good faith and fair dealing is implied into an *existing* contract. Mercury's attempt to imply a covenant into arbitration and delegation clauses for the purposes of determining whether the same clauses constitute binding agreements fails for the same cart-before-the-horse reason that a choice-of-law provision cannot be read into a contract for the purposes of determining whether that contract exists. *See G & M Oil Co. v. Glenfed Fin. Corp.*, 782 F. Supp. 1078, 1083 (D. Md. 1989) (claim for breach of good faith and fair dealing "is viable only if an underlying contract exists").[3] It bears repeating that one of Plaintiff's claims is that *no enforceable agreement for her loan exists – any such agreements are void by operation of law*. *See*, *e.g.*, ECF No. 3 at ¶ 8

---

[3]   This Court has distinguished "the arbitration-clause cases" like *Cheek*, which hold that in the circumstances of a severable arbitration agreement, a change in terms provision results in "an illusory promise that 'does not actually bind or obligate the promisor to do anything,'" from circumstances involving "an 'open term' that has good reason to change over time, is **premised upon a mutually enforceable agreement**, and is limited by the implied covenant to act in good faith and fair dealing." *Bindagraphics, Inc. v. Fox Grp., Inc.*, 377 F. Supp. 3d 565, 576 n.5 (D. Md. 2019) (*citing Cheek*, 835 A.2d 656) (emphasis added).

13

("Because Mercury is in the business of making loans subject to the MCLL but it does not have an MCLL license, its loans to Plaintiff and other Maryland consumers are 'void and unenforceable.' MCLL § 12-3l4(b)(1)(i)."). As a result, Plaintiff does not make any claim that is predicated upon the existence of any contract. Her claim is instead, that *no contract exists*. Moreover, the "clean hands" doctrine bars Mercury from relying on equity to create a contract where it is engaged in illegal, unlicensed lending. *See Hill v. Cross Country Settlements, LLC*, 936 A.2d 343, 360 (Md. 2007)("[C]ourts of equity will not lend their aid to anyone … guilty of … illegal, or inequitable conduct in the matter with relation to which he seeks assistance.")

Finally, the covenant of good faith and fair dealing in Maryland cannot be used to contradict the express terms of a contract. *Enfield Equip. Co. v. John Deere Co.*, 64 F. Supp. 2d 483, 486 (D. Md. 1999). Here, the unilateral change in terms provision expressly permits changes to any term of the arbitration agreement and does not require any notice unless the law requires it. ECF No. 7-5 at 3. To use the implied covenant to contradict this language, so that the unilateral change in terms provision instead *does* require notice even where the law does not require it, and *does* guarantee Plaintiff a right to opt-out of any changes, would impermissibly contradict the plain language of the agreement.

## VII.    Conclusion

For the reasons set forth above, and in her Opposition, Plaintiff respectfully requests that the Court deny Mercury's Motion To Compel Arbitration And Stay Proceedings And To Strike Class Allegations (ECF No. 7).

Respectfully submitted,

/s/Benjamin H. Carney
Richard S. Gordon (Fed. Bar No. 06882)
Benjamin H. Carney (Fed. Bar No. 27984)
GORDON, WOLF & CARNEY, Chtd.
11350 McCormick Road,

Executive Plaza 1, Suite 1000,
Hunt Valley, Maryland 21031
Tel. (410) 825-2300
Fax. (410) 825-0066
rgordon@GWCfirm.com
bcarney@GWCfirm.com

Attorneys for Plaintiff and the Putative Class